UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOMINIQUE RAMSEY and TRAVIS
SAMMONS,

                Plaintiffs,                    Case Number 20-13124

v.                                          Honorable David M. Lawson

DAVID RIVARD, DOUGLAS GOUGH, MARK J.
GAERTNER, and COUNTY OF SAGINAW,

                Defendants.

_____/

## OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE EXPERT WITNESSES

In 2016, plaintiffs Dominique Ramsey and Travis Sammons were convicted of conspiracy

to commit first-degree murder and sentenced to life in prison.  The convictions were based mostly

on evidence of a single-suspect identification procedure that later was held to be improper and

unduly suggestive by Michigan's appellate courts.  By the time the prosecutor agreed to dismiss

the case and release the plaintiffs, they had spent over five years in prison.  They have filed this

civil lawsuit against those involved in the identification and prosecution under 42 U.S.C. § 1983,

alleging violations of their rights under the Due Process Clause and the Fourth Amendment.  Both

sides have filed motions for summary judgment and motions to bar the testimony of expert

witnesses.  The motions are fully briefed, and oral argument will not assist in their resolution.  The

Court will decide the motions on the papers submitted.  E.D. Mich. LR 7.1(f)(2).

In their response to one of the summary judgment motions, the plaintiffs concede that the

claims against Saginaw County must be dismissed.  The claims against defendant Mark Gaertner

are barred by prosecutorial and qualified immunity and will be dismissed.  The facts in the record

do not support a claim against defendant Douglas Gough for malicious prosecution and those

counts of the complaint will be dismissed.  Likewise, the facts do not support the claims against

Gough or defendant David Rivard based on *Brady v. Maryland*, and that count will be dismissed.

However, the facts establish triable claims against Rivard for falsification of evidence, a suggestive

identification procedure, and malicious prosecution, and Rivard is not entitled to qualified

immunity for those claims.  And fact issues preclude summary judgment for the plaintiffs on those

claims.  Finally, the opinion evidence challenged by the respective parties is not subject to

exclusion. Therefore, the plaintiffs' motion for partial summary judgment will be denied.  The

motion for summary judgment by Saginaw County and Gaertner will be granted.  The motion for

summary judgment by defendants Gough and Rivard will be granted in part and denied in part.

And the motions to exclude expert witness testimony will be denied.

I.  Facts and Procedural History

A.  The Homicide Investigation

The plaintiffs were charged with murdering Humberto Casas, who was shot on the street

in Saginaw in the early afternoon of June 21, 2015.  The Saginaw police found two witnesses to

the shooting: sixteen-year-old DyJuan Jones, who was a backseat passenger in his mother's car;

and Rosie Watkins, who was driving her own car.

Jones told the police that he heard the shots.  He said that he saw a light gray Jeep but was

not able to give any more details about the vehicle because he "wasn't paying attention" to the car.

He did view the driver and another man brandishing a gun.  Both were African Americans, and

both wore white shirts.  Jones told the police that the driver appeared to weigh 320 pounds and had

a long beard.  The other man — the gunman — was bald and wore black pants.

Ms. Watkins's description did not conform.  She thought the driver had an average build.

Jones said that he saw the gunman fire three shots at an Hispanic man, pausing when the gun appeared to jam. A moment later, he fired more shots. The Jeep then sped away at a high rate of speed. Jones did not see the gunman enter the Jeep. He did notice that the license tag included the letters "CE" or "GE." Jones and his mother, a nurse, left the scene but returned shortly thereafter to render aid, but the shooting victim died from his injuries.

The ensuing investigation and the arrest of the plaintiffs was summarized by the Michigan Supreme Court in its opinion reversing plaintiff Sammons's conviction:

> About 10 to 20 minutes [after the shooting], the police pulled over defendant Travis Sammons and Dominque Ramsey in a silver Jeep Commander that had the license plate number DFQ 9593. Both men wore white shirts. Ramsey weighed about 150 pounds at the time, and had facial hair that one police officer characterized as "short stubble." Although defendant had a short hairstyle, he was not bald. The officer ordered Ramsey out of the Jeep, searched him, handcuffed him, and put him into the back of the patrol car. The officer then ordered [Sammons] out of the Jeep and searched him. During the search, the officer noticed that [Sammons's] hands were sweaty, which the officer found "pretty odd." With Ramsey's permission, the officer searched the Jeep. Nothing of interest was found in the searches of the men or the Jeep. Both men were taken to the Saginaw Police Department, where they were detained. A photo of the Jeep was taken and shown to Watkins, who identified it as the Jeep from the shooting.
>
> Jones and his mother went to the police station early that evening. Michigan State Police Detective Sergeant David Rivard met them and organized a showup identification of defendant and Ramsey. At the preliminary examination, Detective Sergeant Rivard explained, "it's common that what we can do is call a showup, is to show the possible suspects to — excuse me — show the possible witnesses' [sic] the possible suspects to see if in fact we are doing our investigation in the right direction." He further explained that the showup was conducted because suspects had been identified relatively quickly.
>
> The station has three interview rooms, and the detective sergeant put [Sammons] in one interview room and Ramsey in another. The men were alone in their respective rooms, wore their street clothes, and were unrestrained. The detective sergeant took Jones to the rooms for the purpose of making an identification. The detective sergeant testified there was nothing out of the ordinary about conducting a showup this way. Jones and the detective sergeant would later disagree about what happened next.
>
> Jones would say that he could identify neither man as having been involved in the shooting, while the detective sergeant would say that Jones identified [Sammons]

as the shooter but did not identify Ramsey.  No one witnessed the conversation between Jones and the detective sergeant, and the conversation was not recorded in any way.  Jones did not sign any kind of statement or report indicating that he had made an identification.

Later, the police collected videos from nine security cameras near the crime scene, each showing a Jeep Commander. The police then edited the security videos together with the dashboard camera view of the traffic stop into one video compilation.  One clip showed a Jeep Commander arriving near the crime scene. Another clip showed a Jeep Commander stopping at a house for several minutes, at least one person getting out of the Jeep and going into the house, then at least one person getting back into the Jeep, and it leaving.  Each clip in the compilation showed a Jeep Commander, but none of the clips showed the shooting or the license plates of the vehicles they depicted.

*People v. Sammons*, 505 Mich. 31, 36-40, 949 N.W.2d 36, 40-42 (2020).

## B.  State Court Proceedings

Sammons and Ramsey each were charged with open murder, conspiracy to commit murder, possessing a firearm as a felon, and carrying a firearm during a felony.  The dispute about Jones's alleged identification carried forward into the criminal litigation.   And the allegedly unduly suggestive and falsely reported eyewitness identification of plaintiff Sammons by eyewitness Jones forms the centerpiece of the plaintiffs' claims in this case.  Jones testified twice — at the preliminary examination and at the trial — insisting throughout his testimony that he never identified either plaintiff as the driver or the shooter.  However, Sergeant Rivard testified contrarily that Jones had identified Sammons as the person he saw shoot Casas.  Jones and Rivard presumably will testify in this matter consistently with the state court record from the criminal proceedings.

The record also contains a June 23, 2015 investigation report prepared by Rivard in which he wrote:

At the Saginaw PD on the second floor is three interview rooms.  Interview rooms #2 and #3 are situated down at one end of the hallway where the outer hallway circles around the detectives [sic] work area. Sitting in interview room #2 was Travis Sammons.  Sitting in interview room #3 was Dominique Ramsey.  Both Sammons and Ramsey were sitting in chairs and not wearing any type of clothing

or any type of mechanical restraints (handcuffs) that would indicate they were being held against there [sic] will or arrested.

D/Sgt. Rivard spoke with Jones in private and explained to him that he would like Jones to walk down the hallway and look into rooms #2 and #3.  D/Sgt. Rivard explained to Jones that once he has walked by and viewed the individuals in the rooms to come back to where he was standing at the end of the hallway and explain to him if he recognized either person and how he recognized them.

Jones walked down the hallway looked into both rooms and then returned to where D/Sgt. Rivard was standing.  Jones looked at D/Sgt. Rivard and stated the guy in #2 is the shooter.  Jones went on to say that the guy in #2 was the guy he saw standing over the other guy and was shooting him.  D/Sgt. Rivard verified with Jones that he was referring to the shooting that he saw earlier today on Cumberland St. within the City of Saginaw.  Jones stated yes that was what he was talking about.  D/Sgt. Rivard asked Jones about the individual in room #3.  Jones stated he did not recognize that person.

Police Report dated June 23, 2015, ECF No. 61-4, PageID.671-72.

At the preliminary examination, Jones was questioned by defendant Saginaw County Assistant Prosecutor Mark Gaertner. After Jones disclaimed making any identification of the shooter, Gaertner asked him to review Rivard's investigation report and then pressed him further:

Q. All right, now I'm gonna ask you some questions and you tell me whether you remember or it didn't happen or what, all right, just tell the truth?  Do you remember walking down the hallway and after walking down the hallway you told the Sergeant at to who was in what room and who did the shooting?

A. No sir.

Q. You don't remember that?

A. No sir, I didn't tell anybody about a shooter.

Q. You remember being asked who was in the other room?

A. Yes, he asked me did I see two people in a room.

Q. All right, you remember that?

A. Yes sir.

Q. You remember not making an identification at that time?

A. Yes sir.

Q. Do you remember telling the Detective[] Sergeant that the guy in room number 2 was the shooter?

A. No sir.

Q. You don't remember that?

A. I didn't say that.

Q. — Do you remember[] saying that the guy in room number 2 was the guy that you saw standing over the other guy and shooting?

A. No sir.

Q. You don't remember that?

A. I didn't say that.

Q. You didn't say that?

A. Yes sir.

Q. So, this report is not correct?

A. Yes sir.

Prelim. Exam. Tr., ECF No. 61-2, PageID.561-63.

Despite denying making an identification, Jones did testify about his recollection of the shooting. Jones stated that he was sitting the back seat of his mother's car when he heard a sound like firecrackers to his left. Prelim. Exam. Tr at PageID.552-53. He looked in the direction of the sound and saw a vehicle that he described as a "gray Jeep." *Id.* at PageID.553. When asked if anyone was in the vehicle, Jones stated that he "seen someone in it," but that he "wasn't paying attention to who was outside of it." *Id.* at PageID.554. Jones stated that the persons in and out of the vehicle both were "black males" wearing "white shirts." *Ibid.* He also described the driver of the vehicle as "heavy set." *Id.* at PageID.556. When asked if he saw "anybody with a gun," Jones stated: "I seen the gun, I can't identify the person who was [sic] really." *Id.* at PageID.555. The driver remained in the vehicle while the person with the gun shot an Hispanic male several times,

stopping for about five seconds to clear the weapon when it jammed.  *Id.* at PageID.555-56.  The entire incident took "less than a minute," and after the shooting stopped the gunman got back in the car, which sped away at 60 or 70 miles per hour.  *Id.* at PageID.556-57.

The parties also dispute the extent of defendant Gaertner's involvement in the identification procedure.  The particulars of his role in the ensuing prosecution are undisputed.  Detective Rivard testified that while Sammons and Ramsey were being held at the Saginaw police station, he called defendant Gaertner, who then was the chief assistant prosecutor for Saginaw County, to discuss which of several contemplated options for an identification procedure should be used.  David Rivard dep, ECF No. 81-14, PageID.4104.  Rivard had discussed with two detectives of the Saginaw Police Department whether to conduct a photo lineup, a corporeal lineup, or a single suspect showup.  *Ibid.*  Rivard understood, however, that a photo lineup would not be appropriate because the suspects were being held at the police station, and in that circumstance a corporeal lineup would be a "better option."  *Ibid.*  Defendant Trooper Gough was not present during this discussion and apparently had no involvement in the decision to conduct a showup, because, according to Rivard, he was "out canvassing the neighborhood" and "working on the case."  *Ibid.*  The discussion concluded with Rivard deciding he would call Gaertner to ask for advice on which procedure to use for an attempted identification.  *Ibid.*

Rivard recalled the conversation and discussed the telephone exchange in detail at his deposition.  According to Rivard, the conversation went as follows:

Q. . . . Mark Gaertner wouldn't even know a crime was committed at this point.

A. Correct.

Q. Okay.

A. So, I called him, explained to him, you know, just a couple hours ago there was a homicide in the city, here's the circumstances that we have — gave him a rundown of where the investigation is.

. . .

Q. You told me already you — they weren't arrested at the scene because you didn't have probable cause, just given what you knew at the time —

A. Correct.

Q. — right? Okay. So, the — you tell Prosecutor Gaertner here's our situation, and you run it down.

A. Yes.

Q. Yes? Tell me what you're running down for him. All the facts.

A. I explained to him that there was a homicide in the city, that there were witnesses that identified a vehicle with a plate. A short time later, another agency stopped the vehicle, and they were holding those individuals. They were back to the PD for questioning. That there were witnesses that were there, and that the witnesses are at the PD now, and they made statements to other detectives that they saw what happened and they could possibly identify who the shooter is.

And what are our options now, then to see if the witnesses can identify the individuals of interest or not? So, we discussed the differences between the photo lineup, the corporeal lineup, or doing a showup of having them look through it.

After the discussion of the photo lineup — with them being detained, we didn't want to let them go to do a photo lineup. To a corporeal lineup, that — we didn't have the resources to set up to get five other individuals to put that together. That the showup was the most reasonable — these circumstances to do it.

The prosecutor at that point said, you know, you just got to make sure — you can't be suggestive. Are they in cuffs? Are they in custody? Are the police officers near them? You know, are they in jail clothes? Anything like that?

And it was explained to him that, no, they are sitting in the clothes that they came in, street civilian clothes. They're not handcuffed to anything. There's no indication to show that they are under arrest for anything, and we'd use the terminology of — have them go down there, look inside, and see if they can identify who's in the room — if they know them and, if so, how? So —

Q. That's what Gaertner advised you?

A. Yes. So, I explained to him the terminology of — that's how I would explain it to him, then. I would have the witnesses go down to the rooms, look inside, have them come back to me, and see if — if they did recognize them, how they recognized them, so that there would be no suggestion of whether they're involved. And it was discussed — because I said, these interview rooms are used for all purposes: suspects, witnesses, victims. . . .

Q. How . . . . big are the interview rooms?

A. Ten by ten.

Q. Okay.

A. 10 foot by 10 foot, pretty much. Tables —

Q. A desk and —

A. — chairs —

Q. — a couple chairs?

A. Yes.

Q. Like we see on Dateline?

A. Pretty much.

. . .

Q. — the agreement between you and the prosecutor is you're going to have DyJuan Jones and [Felicia Little] go down the hall, and you're going to tell them, see if you recognize anybody in those two rooms, and, if you do, tell us how you recognize them; is that right?

A. Correct.

. . .

Q. Okay. So ultimately, between you and Prosecutor Gaertner, you decided that was the appropriate method of identification, the showup, correct?

. . .

A. Yes.

Q. You took his advice?

A. Yes.

Rivard dep. at PageID.4105-06, 4108.

In the trial court, Sammons moved to suppress the identification evidence and objected to Rivard's testimony. That court held that although the identification process was unnecessarily suggestive, the identification itself nonetheless was reliable, and it denied the motions. Jones's

testimony at trial mirrored his preliminary examination testimony, as did Rivard's.  Watkins also

testified, stating that she saw the assailants flee in a "[g]ray, silver Jeep, whatever you call those

things." *Sammons*, 505 Mich. at 40, 949 N.W.2d at 42.  But she was unable to estimate the age of

the vehicle she saw, explaining, "I don't know the difference, new, old.  I know it looked like a

Jeep." *Ibid.*

   The jury convicted both plaintiffs of conspiracy to commit murder and acquitted them of

all the other charged offenses.  Both plaintiffs filed motions for a directed verdict or a new trial.

The trial court denied Sammons's motion but granted Ramsey's motion.  Sammons was sentenced

to life in prison without the possibility of parole.  *People v. Sammons*, No. 332190, 2017 WL

2882493, at *1 (Mich. Ct. App. July 6, 2017), *rev'd*, 505 Mich. 31, 949 N.W.2d 36 (2020).  The

State appealed the ruling granting Ramsey's motion for a directed verdict, and Sammons appealed

his conviction and sentence.  Ramsey remained incarcerated throughout the course of the appeals.

   On July 6, 2017, the Michigan Court of Appeals affirmed Sammons's conviction and

sentence.  Sammons appealed to the Michigan Supreme Court, which ordered the parties to file

supplemental briefs on the question whether the show-up identification was impermissibly

suggestive, and if so, whether the result nevertheless was reliable.  *People v. Sammons*, 503 Mich.

910, 919 N.W.2d 400 (2018).  On March 16, 2020, the Michigan Supreme Court reversed the court

of appeals, vacated Sammons's conviction, and remanded the case to the Saginaw County circuit

court for a new trial.  *People v. Sammons*, 505 Mich. 31, 59, 949 N.W.2d 36, 53 (2020).

   Ramsey's appeal took a more circuitous track.  On April 24, 2018, the Michigan Court of

Appeals vacated the trial court's ruling and ordered the case remanded for imposition of sentence.

*People v. Ramsey*, No. 334614, 2018 WL 1940190, at *1 (Mich. Ct. App. Apr. 24, 2018).  The

Michigan Supreme Court granted leave to appeal and reversed in part, finding that the intermediate

court had applied an incorrect standard of review, and remanded the case for reconsideration of the directed verdict ruling under the correct rule of decision. *People v. Ramsey*, 503 Mich. 941, 921 N.W.2d 538 (2019). On July 2, 2019, the intermediate court issued a second ruling reversing the trial court. *People v. Ramsey*, No. 334614, 2019 WL 2866053, at *1 (Mich. Ct. App. July 2, 2019). Ramsey again applied for leave to appeal, and on May 27, 2020, the Supreme Court summarily remanded the case to the court of appeals for reconsideration in light of its recent ruling on Sammons's appeal. *People v. Ramsey*, 505 Mich. 1084, 943 N.W.2d 138 (2020). On September 10, 2020, the court of appeals held that the same error identified in Sammons's appeal also entitled Ramsey to a new trial, and accordingly it remanded the case for a new trial. *People v. Ramsey*, No. 334614, 2020 WL 5494571, at *1 (Mich. Ct. App. Sept. 10, 2020).

Back in the trial court, the prosecutor filed a motion for *nolle prosequi* on the ground that there was insufficient evidence to secure a conviction following the reversals on appeal. The trial court granted the motion on October 30, 2020. Order, ECF No. 72-23, PageID.3287. On November 25, 2020, the plaintiffs filed the instant suit in this Court.

The complaint says Ramsey was arrested on June 25, 2015, and Sammons was arrested on June 26, 2015. Fourth Am. Compl. ¶¶ 52-53. They both were released on October 30, 2020. Ramsey alleges that he spent a total of 1,955 days in custody (5 years, 4 months, six days), and Sammons was in custody for one day less. *Id.* ¶¶ 76-78.

### C. Proceedings in This Case

The plaintiffs filed their civil rights complaint on November 25, 2020. After a period of discovery, a series of amended complaints were filed, culminating in a fourth amended complaint. The operative pleading states causes of action via 42 U.S.C. § 1983 for (1) fabrication of evidence (Count I), (2) use of an unduly suggestive eyewitness identification procedure (Count II), (3)

malicious prosecution (Count III), (4) "*Brady* violations" (Count IV), and (5) municipal liability against defendant Saginaw County (Count V).  In Count VI, the complaint also pleads claims for malicious prosecution under state law against defendants Gough and Rivard.

Count I alleging falsification of evidence initially was pleaded against defendants Gough and Rivard jointly.  Count II initially was pleaded against all defendants.  However, on November 30, 2022, the Court entered an order by stipulation of the parties dismissing the Count I and II claims against defendant Gough.  As presently framed, the surviving claims are against defendant Rivard only for falsification of evidence (Count I), and against Rivard and Gaertner for conducting an unduly suggestive identification (Count II).  The federal malicious prosecution claim in Count III is pleaded against all defendants and premised on the use of both Rivard's allegedly false report and testimony as well as reliance on the constitutionally defective showup identification during the bindover and trial.  The *Brady* violations pleaded in Count IV and the state law malicious prosecution claim in Count VI are pleaded against Rivard and Gough only.

After discovery concluded, the plaintiff moved to exclude opinion testimony by the police officers and by prosecutor Gaertner.  The defendants moved to exclude the testimony of the plaintiffs' police practices expert witness.  And the parties filed cross-motions for summary judgment.

## II.  Motions Challenging Opinion Testimony by Police Officer and Prosecutor Defendants

The plaintiffs seek an order preventing defendants Rivard and Gough from testifying that they "had probable cause," to arrest or prosecute the plaintiffs, "did not fabricate evidence," and "did not violate their *Brady* obligations," because those "opinions" were not disclosed in the form of expert witness reports under Federal Rule of Civil Procedure 26(a)(2)(C) (governing disclosures by "non-retained experts").  They also contend that the testimony would amount to an

impermissible expert opinion on a legal issue and would not be helpful to the jury. Similarly, the plaintiffs ask the Court to preclude defendant Mark Gaertner from expressing any "expert opinions" to the effect that (1) "the plaintiffs received due process," (2) the show-up procedure was not "unduly suggestive," (3) Gaertner "had no reason to believe Rivard lied to him" and he thought that Rivard was "credible," and (4) in his opinion the plaintiffs were involved in the murder of Humberto Casas.

Under Federal Rule of Civil Procedure 26(a)(2)(A), "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." In addition, "[u]nless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report — prepared and signed by the witness — if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B).

An expert witness is not required to prepare and sign a written report of his or her investigation and opinion where the expert was not "retained or specially employed to provide expert testimony in the case" and the witness's "duties as the [defendants'] employee [do not] regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B). Where a witness's "opinion testimony arises not from his enlistment as an expert but, rather, from his ground-level involvement in the events giving rise to the litigation . . . he falls outside the compass of Rule 26(a)(2)(B)." *Downey v. Bob's Discount Furniture Holdings, Inc.*, 633 F.3d 1, 6 (1st Cir. 2011) (citing *Fielden v. CSX Transportation, Inc.*, 482 F.3d 866, 869 (6th Cir. 2007)). For those witnesses expected to give opinion testimony under Evidence Rule 702, counsel for a party must disclose to the other party "the subject matter on which the witness is expected to present evidence

under Federal Rule of Evidence 702, 703, or 705" and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C).

Either way, the feature of testimony that triggers a disclosure obligation under Rule 26(a)(2) is an expectation that the opinion testimony will be offered through Evidence Rule 702. As a general matter, "expert" testimony under that rule consists of opinions or commentary grounded in "specialized knowledge," that is, knowledge that is "beyond the ken of the average juror." *See United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016), *cert. denied sub nom. Casillas v. United States*, 137 S. Ct. 1120 (2017), *and cert. denied*, 138 S. Ct. 2701 (2018); *see also* Fed. R. Evid. 702. So called "lay opinion testimony" is admissible when it is "(1) 'rationally based on the witness's perception,' (2) 'helpful to clearly understanding the witness's testimony or to determining a fact in issue,' and (3) is 'not based on scientific, technical, or other specialized knowledge.'" *United States v. Rahim*, 771 F. App'x 605, 612 (6th Cir. 2019) (quoting Fed. R. Evid. 701). Lay opinion testimony does not require advance disclosure under Rule 26(a)(2).

The plaintiff's motion challenging the anticipated testimony of defendants Rivard and Gough as expert testimony misses the mark. In their opposition to the motion, those defendants outline proposed testimony that falls within the ken of either straightforward factual information or lay opinions based on facts discovered during the criminal investigation. Appropriate limiting instructions may be issued to cabin the consideration by the jury of any "opinions" that stray beyond those customary boundaries for lay witness testimony.

First, the testimony by defendant Rivard that he did not fabricate information about Jones's eyewitness identification is a straightforward factual rebuttal to the allegation that he lied about the conversation he had with Jones during the showup procedure. Testimony that Rivard and Gough had no knowledge that Rivard lied (because, they claim, he did not lie), likewise rebuts the

plaintiffs' claim that they "withheld" exculpatory information in violation of their duty to disclose contrary facts under *Brady*.

Second, limited testimony about why the defendants concluded that the plaintiffs were involved in the shooting is permissible under Rule 701 as long as such conclusions were founded on ordinary facts discovered by the defendants during the course of the investigation — for example, testimony that the defendants were suspected initially because they matched the race and gender of the suspects described by eyewitnesses, and because they were seen driving a similar vehicle in the vicinity of the crime.  It is well established that "[t]estimony regarding specific instances and interactions between [persons] is not opinion testimony subject to the limitations of Federal Rule of Evidence 701 [or 702]," and, "the opinion of a witness regarding the motivations of an individual is admissible under Rule 701, as long as the witness provides an adequate foundation and does not provide legal conclusions."  *Kienzle v. Gen. Motors, LLC*, No. 11-11930, 2013 WL 511397, at *8 (E.D. Mich. Feb. 12, 2013) (citing *Torres v. County of Oakland*, 758 F.2d 147, 149-150 (6th Cir.1985) (quoting 3 J. Weinstein and M. Berger, Weinstein's Evidence ¶ 701[03], p. 701-711 (1982))).

If the defendants' testimony strays into impermissible zones such as purporting to express opinions about whether their conduct was unlawful under the relevant constitutional standards, or whether another witness's testimony ought to be believed, the testimony may be challenged by contemporaneous objection or neutered by an appropriate limiting instruction.  Otherwise, there is no basis at present to bar their testimony.

The plaintiffs' motion directed at the expected testimony of defendant Mark Gaertner similarly must be denied in part.  To begin, Gaertner responds that he does not intend to testify either that the plaintiffs "received due process" or that the showup was not "unduly suggestive."

He does contend, however, that he should be allowed to testify about the facts demonstrating what process the plaintiffs received and what evidence formed the basis for their prosecution. He also wants to testify about his conversation with Sergeant Rivard, that he told Rivard that the identification procedure could not be suggestive, and what he meant by that in the context of the conversation.

None of that proposed testimony amounts to expert opinions that would rely on Rule 702 for admission. It merely would constitute testimony about facts within Gaertner's personal knowledge, such as the substance of the conversation with Rivard discussing the showup procedure, and the facts uncovered by the investigation that led to his decision to obtain warrants and pursue a criminal prosecution. Gaertner indicates that he has no intention to express to the jury any proposed legal conclusions that are within their province to determine, such as whether the plaintiffs received due process or whether the identification showup was unduly suggestive according to the applicable rules of decision. He would not be permitted to do so in any event, and if he would wander into those precincts, the plaintiffs may address that diversion with a contemporaneous objection.

Gaertner also says, however, that he wants to give his opinions that Rivard was not lying to him and that the plaintiffs were involved in the murder. He suggests that those opinions would be admissible under Rule 701 because they are rationally related to facts perceived by Gaertner after years of working with Rivard and observing his conduct during investigations, as well as "facts learned through the investigation" of the murders. The Court disagrees. Gaertner's belief that the plaintiffs were involved in the murder could not possibly be based on his "perception," since that opinion of necessity must come from information furnished to him by others. *Compare* Fed. R. Evid. 701 *with* Fed. R. Evid. 703. And there is no basis to permit defense counsel to elicit

any opinion testimony by Gaertner purporting to vouch for the credibility of other witnesses. *See Hobart Corp. v. Dayton Power & Light Co.*, No. 13-115, 2019 WL 4593589, at *7 (S.D. Ohio Sept. 23, 2019) ("It is clearly established that expert witness testimony concerning the credibility of a fact witness is improper.") (citing *Greenwell v. Boatwright*, 184 F.3d 492, 496 (6th Cir. 1999); *see also ibid.* ("'Such testimony: (1) usurps a critical function of the jury; (2) is not helpful to the jury, which can make its own determination of credibility; and (3) when provided by impressively qualified experts on the credibility of other witnesses is prejudicial and unduly influences the jury.'" (quoting *United States v. Hill*, 749 F.3d 1250, 1258 (10th Cir. 2014)).

The plaintiffs' motion to bar certain testimony from defendants Rivard and Gough will be denied, and their motion to exclude certain testimony from defendant Gaertner will be granted in part and denied in part.

### III. Defendants' Motions to Exclude Testimony from Plaintiffs' Police Practices Expert

The defendants in separate motions want to prevent the plaintiffs' police practices expert Denver Butler from offering the following opinions expressed in his report: (1) "The showup of suspects, Mr. Travis Sammons and Mr. Dominique Ramsey, at the Saginaw Police Department violated clearly established protocols, procedures and best practices and should not have been conducted"; (2) "D/Sgt. Rivard violated national police standards for eyewitness identification procedures by not having the witness, Mr. DyJuan Jones, write a statement of identification or document the identification and level of certainty, which suggests (as Mr. Jones testified) that no such identification occurred"; (3) "releasing the shooter after an eyewitness to the murder identified him is reckless at best and not supported by any law enforcement practice or policy," and "[i]f the alleged positive identification occurred, Mr. Jones and any other witness known to the shooter were unknowingly put in grave danger by D/Sgt Rivard and D/Tpr Gough"; (4)

defendant Rivard failed to pursue an adequate investigation by overlooking several opportunities for collecting evidence such as by failing to perform any gunshot residue or DNA testing of the plaintiffs' apparel and vehicle or other items found at the scene; (5) defendant "Gough failed to follow up on credible information provided by the victim's family related to a motive and identifiable potential suspect(s) despite a lack of probable cause to arrest Mr. Sammons and Mr. Ramsey"; and  (6) "[t]he handling of the Humberto Casas murder investigation by D/Sgt David Rivard, D/Tpr Douglas Gough, did not meet the generally accepted standards of investigative behavior in a murder investigation, especially with respect to the showup identification, and candor in reporting and testifying."

The State defendants argue that all of these opinions either are unfounded on the record facts, irrelevant, or would comprise advocacy from the witness stand by opining on legal conclusions and assessments of the credibility and truthfulness of witnesses or information without foundation.  The County defendants argue additionally that whether the identification procedure complied with "best practices" or "national standards" is irrelevant to the question the jury will be called upon to decide, which is whether the showup procedure was unconstitutionally suggestive.

Opinion testimony by so-called expert witnesses is governed by Evidence Rule 702, which was modified in December 2000 to reflect the Supreme Court's emphasis in *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), on the trial court's gate-keeping obligation to conduct a preliminary assessment of relevance and reliability whenever a witness testifies to an opinion based on specialized knowledge.  Rule 702 allows a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" to give opinions based on information furnished to that witness by others.  But the witness's special knowledge must be helpful to the factfinder, it must be based

on "sufficient facts or data," it must flow from "reliable principles and methods," and it must "reliably appl[y] the principles and methods to the facts of the case."  Fed. R. Evid. 702(a)-(d). The language added by the 2000 amendment — subparagraphs (b) through (d) — restates *Daubert*'s insistence on the requirements that an expert's opinion be based on a foundation grounded in the actual facts of the case, that the opinion is valid according to the discipline that furnished the base of special knowledge, and that the expert appropriately "fits" the facts of the case into the theories and methods he or she espouses.  *See Daubert*, 509 U.S. at 591-93.  An expert witness's testimony also must be relevant and reliable.  *United States v. LaVictor*, 848 F.3d 428, 441 (6th Cir. 2017) (citing *Daubert*, 509 U.S. at 589).

The fact that a police practices expert's opinions align with the plaintiffs' theory of the case does not render the evidence inadmissible.  Such evidence does not amount to a closing argument masquerading as witness testimony, as the defendants contend.  Instead, "[t]estimony by police practices experts routinely is admitted in civil rights litigation for its bearing on such matters as (1) whether an officer's repeated deviations from accepted standards of police practices suggest that his conduct was intentional or pursued recklessly in disregard of the plaintiff's rights; or (2) as pertinent to the question of qualified immunity, to the extent that the expert's descriptions of the defendants' practices are inconsistent with constitutional requirements, to show that a reasonable officer in the defendants' positions would have been aware that his conduct was unconstitutional."  *Sanford v. Russell*, 387 F. Supp. 3d 774, 790 (E.D. Mich. 2019) (Lawson, J.).

Expert opinions about "minimally accepted police practices, [which are] a baseline type of behavior or protocols that law enforcement officers follow," are relevant "to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional

rights." *Restivo v. Hessemann*, 846 F.3d 547, 579-80 (2d Cir. 2017) (citations and quotations omitted). Expert testimony along these lines is a common feature of section 1983 cases involving police investigations where impropriety is alleged, as here. "Courts have permitted experts to testify about discrete police-practice issues when those experts are properly credentialed and their testimony assists the trier of fact." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 908-09 (6th Cir. 2004) (citations omitted).

The defendants have not advanced any persuasive argument for departing from that line of authority here. Nor have they raised any challenge to Butler's qualifications and experience, or generally to the factual foundations of his opinions.

It is true that in some respects Butler's opinions based on the facts of the case in the context of his experience may tend to call into question the credibility of testimony by Rivard and Gough about why they took the actions that they did. For example, his opinion that it was unusual and imprudent to release a suspect from custody who had been identified by an eyewitness as involved in a violent homicide calls into question the veracity of Rivard's testimony that Jones identified Sammons as the shooter. (It is undisputed that both Sammons and Ramsey subsequently were released for some time before their ultimate arrests.) However, Butler's opinions about typical police procedures under the circumstances are not objectionable merely because they highlight how the defendants' version of disputed facts does not align with their undisputed conduct, thereby prompting doubts about the veracity of their testimony. *See Boerste v. Ellis, LLC*, No. 17-00298, 2021 WL 6101678, at *10 (W.D. Ky. Sept. 29, 2021), *R&R adopted*, 2021 WL 5449003 (W.D. Ky. Nov. 22, 2021) (noting that pointing out inconsistencies in a party's testimony "alone is not an improper assessment of credibility, although it does constitute a basis on which a jury might find [the witness] not to be credible.").

The proposed testimony here is relevant.  In cases involving police practices experts, the Sixth Circuit has interpreted Rule 702's relevance requirement "to mean that the district court, in performing its gatekeeping role, must assess whether, 'without expert testimony, the average juror is unlikely to understand' the material about which the expert proposes to testify." *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016).  In this case, Butler's "comprehensive accounting of accepted police investigative techniques and the defendants' many specific deviations from them certainly embrace matters which the average person is unlikely to have any experience or understanding of from their own background." *Sanford*, 387 F. Supp. 3d at 790.  As long as Butler's opinions do not stray from those well-worn lanes, they will be admitted.

The defendants' motions to exclude Butler's opinion testimony will be denied.

### IV.  County Defendants' Motion for Summary Judgment

The claims that remain against the County defendants in the fourth amended complaint are a denial of due process based on an unduly suggestive identification procedure leveled against defendant Gaertner (and state defendant Rivard) (Count II), malicious prosecution against Gaertner (Count III), and *Monell* claims against Saginaw County (Count V).  The plaintiffs concede that the County is not a proper party to the case and do not oppose dismissal of Count V.  Defendant Gaertner argues that the remaining claims against him should be dismissed for a host of reasons.  Only two arguments need be addressed, though: those based on absolute prosecutorial immunity and qualified immunity.

We will address each of the counts in turn.  First, however, it should be remembered that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable

inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in dispute. *Id.* at 558. (citing *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

The plaintiffs also filed a motion for summary judgment. But the fact that the parties have filed cross motions does not automatically justify the conclusion that there are no facts in dispute. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate."). Instead, the Court must apply the well-recognized summary judgment standards when deciding such cross motions: the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

### A.  Malicious Prosecution (Count III)

Defendant Gaertner has established that prosecutorial absolute immunity shields him from liability for the federal malicious prosecution claim.

"[A] prosecutor is absolutely immune from liability for 'initiating a prosecution' and 'presenting the State's case.'"  *Howard v. Livingston County*, No. 21-1689, 2023 WL 334894, at *4 (6th Cir. Jan. 20, 2023) (citing *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976)).  Determining whether a prosecutor's conduct falls within those categories calls for a "functional approach." *Ibid.* (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)).  "This approach looks to 'the nature of the function performed, not the identity of the actor who performed it.'"  *Ibid.* (quoting *Buckley*, *supra*; *Forrester v. White*, 484 U.S. 219, 229 (1988)).  "Under the functional approach, 'the official seeking absolute immunity bears the burden of showing that [absolute] immunity is justified for the function in question.'"  *Ibid.* (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991)). "Courts have been 'quite sparing' in extending this immunity to state actors in the § 1983 context." *Ibid.* (citing *Buckley*, 509 U.S. at 269; *Forrester*, 484 U.S. at 224).  "A prosecutor is entitled to absolute immunity only when that prosecutor acts 'as an advocate for the State' and engages in activity that is 'intimately associated with the judicial phase of the criminal process.'"  *Ibid.* (quoting *Imbler*, 424 U.S. at 430).

The Supreme Court has explained that '[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity.'"  *Ibid.* (quoting *Buckley*, 509 U.S. at 273).  "For example, a prosecutor who 'performs the investigative functions normally performed by a detective or police officer' such as 'searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested' is not entitled to absolute immunity because that immunity does not protect 'the investigative functions normally performed by a detective or police officer.'"  *Ibid.* (quoting *Buckley*).

- 23 -

"The Supreme Court has made clear that the applicability of prosecutorial immunity depends on whether the conduct at issue is intimately connected to the judicial process, though the line between conduct that is part of a preliminary investigation and conduct that is 'intimately associated with the judicial phase of a criminal proceeding' may be difficult to draw." *Howard*, 2023 WL 334894, at *4 (citing *Burns*, 500 U.S. at 495) ("Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive.").  "Nevertheless, the approach endorsed by the Supreme Court in *Burns* and *Buckley*, and repeatedly applied by [the Sixth Circuit], focuses on the specific conduct at issue and requires [the Court] to determine whether a prosecutor was acting as an advocate for the state, or was simply engaging in preparatory conduct and performing administrative or investigative functions." *Ibid.* (citing *Stockdale v. Helper*, 979 F.3d 498, 302-06 (6th Cir. 2020) (rejecting absolute immunity for personnel action taken by prosecutor); *Rieves v. Town of Smyrna*, 959 F.3d 678, 690-92 (6th Cir. 2020) (denying absolute immunity for conduct prior to initiation of judicial proceedings)).

The plaintiffs' arguments to sustain Count III against defendant Gaertner assert nothing more than that Gaertner is liable for "malicious prosecution" because he "influenced the initiation and continuation" of the criminal proceedings by (1) recommending an arrest warrant and (2) presenting Rivard's false testimony at the preliminary examination.  But it is well settled that such acts comprise prosecutorial conduct inherent to the presentation of the State's case in a criminal prosecution, making Gaertner immune from suit.

It is well settled that a prosecutor is entitled to absolute immunity when he acts "as an advocate for the State"; recommending an arrest warrant and presenting testimony in court — true

or false — are activities "intimately associated with the judicial phase of the criminal process."
*Imbler*, 424 U.S. at 430.  Gaertner, therefore, is absolutely immune from liability for "initiating a
prosecution" and "presenting the State's case."  *Id.* at 431.  His initiation of the prosecution and
presentation of the State's case at a preliminary examination are acts that are shielded by absolute
immunity, because they are inherent to the judicial phase of the criminal prosecution.  *Hall v. City
of Williamsburg*, 768 F. App'x 366, 374 (6th Cir. 2019) ("Trimble's actions in seeking search and
arrest warrants are 'prosecutorial' functions that are protected by absolute immunity." (citing
*Burns*, 500 U.S. at 491-92)); *Wilson v. City of Shaker Heights*, 741 F. App'x 312, 315-16 (6th Cir.
2018) ("The preparation and submission of a criminal complaint is integral to the initiation of
criminal judicial proceedings against a defendant, notwithstanding whether the proceeding ever
reaches the trial stage.  Keller's decision to submit the complaint, which decision was based upon
his evaluation of the evidence he had on hand, is therefore protected by prosecutorial immunity.").

No claim has been advanced that Gaertner participated in any other way in the instigation
of a prosecution — e.g., by engaging directly in the "fabrication" of false evidence.  Count III of
the fourth amended complaint will be dismissed as to defendant Gaertner.

### B.  Unduly Suggestive Identification (Count II)

Gaertner's interaction with defendant Rivard over the stationhouse identification procedure
was not part of the judicial phase of a criminal proceeding.  Instead, it was an investigatory function
that will not trigger absolute immunity for Gaertner.  *Buckley*, 509 U.S. at 273; *Jackson v. City of
Cleveland*, 64 F.4th 736, 744 (6th Cir. 2023) (quoting *Koubriti v. Convertino*, 593 F.3d 459, 467
(6th Cir. 2010)) (citations omitted).  However, Gaertner argues that he is entitled to qualified
immunity for that conduct.

When the qualified immunity defense is raised in a motion for summary judgment, courts must weave the summary judgment standard into each step of the qualified immunity analysis. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The plaintiff is obliged to demonstrate with evidence in the record both that the challenged conduct violated a constitutional right and that the right was clearly established at the time. *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)). "If the plaintiff fails to establish either element, the defendant is immune from suit." *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014). But under the summary judgment standard, the Court must view the facts in the light most favorable to the plaintiff, *Saucier v. Katz*, 533 U.S. 194, 201 (2001); "[i]n qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts," *Scott*, 550 U.S. at 378.

"A right is 'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Even when there is no case defining a constitutional right that directly mirrors the fact pattern confronted by the defendant, "'an official can be on notice that his conduct violates established law even in novel factual situations.'" *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 898 (6th Cir. 2019) (quoting *Littlejohn v. Myers*, 684 F. App'x 563, 569 (6th Cir. 2017); *Hope v. Pelzer*, 536 U.S. 730, 731 (2002)). The touchstone of the "clearly established" inquiry is "fair warning." *Baynes*, 799 F.3d at 612-13 (quoting *Hope*, 536 U.S. at 741). "Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). And because the defense must be applied to specific situations, courts "must not 'define clearly

established law at a high level of generality.'" *Tlapanco v. Elges*, 969 F.3d 638, 649 (6th Cir. 2020) (quoting *Kisela v. Hughes*, 584 U.S. ---, 138 S. Ct. 1148, 1152 (2018)).

This defense insulates state actors from liability in close-call situations. *See Saucier*, 533 U.S. at 206 (explaining that the defense is intended to protect state actors who must operate along the "hazy border" that divides acceptable from unreasonable conduct). The purpose of the defense is to strike a balance that "accommodates the tension between permitting litigants to recover damages, which is often the only realistic avenue for vindication of constitutional guarantees, and the social costs of such suits, including the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004). It has been said that qualified "immunity protects all but the plainly incompetent or those who knowingly violate the law." *Tlapanco*, 969 F.3d at 649 (quoting *Kisela*, 138 S. Ct. at 1152).

The plaintiffs seek to hold Gaertner accountable for his actions that preceded the initiation of formal proceedings that consisted of advising Rivard about the suitability of the showup procedure during the plaintiffs' initial detention. They contend that this conduct deprived them of their rights under the Due Process Clause of the Fourteenth Amendment. Construing Rivard's testimony favorably to the plaintiffs, a jury could find that Gaertner encouraged the use of the showup procedure over other alternatives such as a live or photographic lineup and advised Rivard that the procedure was acceptable. However, no reasonable official in Gaertner's position would have been on notice that he was violating any constitutional prohibition, because there is no clearly established right to be free from a suggestive identification procedure *per se*. The constitutional injury occurs, if at all, only when the procedure produces an unreliable identification and the *result*

of a suggestive identification lineup is admitted in evidence against the suspect, or if it is found to taint a subsequent in-court identification.

The Supreme Court has "'explained that a suggestive identification procedure does not in itself intrude upon a constitutionally protected interest.'" *Perry v. New Hampshire*, 565 U.S. 228, 253 (2012) (Sotomayor, J., dissenting) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 113 (1977) ("Unlike a warrantless search, a suggestive preindictment identification procedure does not in itself intrude upon a constitutionally protected interest.")). "'Suggestive confrontations are disapproved because they increase the likelihood of misidentification'—and '[i]t is the likelihood of misidentification which violates a defendant's right to due process.'" *Ibid.* (quoting *Neil v. Biggers*, 409 U.S. 188, 198 (1972)). "'The due process clause applies only to proceedings which result in a deprivation of life, liberty or property,'" and "'if a constitutional violation results from a showup, *it occurs in the courtroom, not in the police station*.'" *Ibid.* (quoting *United States ex rel. Kirby v. Sturges*, 510 F.2d 397, 406 (7th Cir. 1975) ("The due process clause applies only to proceedings which result in a deprivation of life, liberty or property. The due process issue, therefore, does not arise until testimony about the showup — or perhaps obtained as a result of the showup — is offered at the criminal trial.")) (emphasis added). "In short, 'what the *Stovall* due process right protects is an evidentiary interest.'" *Ibid.* (quoting *Manson*, 432 U.S. at 113 n.14); *see also Hensley v. Carey*, 818 F.2d 646, 650 (7th Cir. 1987) ("*Stovall* and *Brathwaite* establish procedural safeguards to insure that only reliable identification evidence is admitted at trial. *Stovall* and *Brathwaite* do not establish a right to an impartial lineup as long as the evidence gained through that lineup is not used at trial. Thus, the defendants could not have violated Hensley's constitutional rights simply by subjecting him to a lineup which was allegedly unduly suggestive.") (cleaned up).

Gaertner's advice to Rivard did not violate the plaintiffs' constitutional rights because there was nothing unconstitutional about merely conducting a showup in the first instance, regardless of how suggestive the procedure may have been.  For his investigative-phase advisory role in the case, Gaertner therefore is entitled to qualified immunity.  Count II, therefore, will be dismissed as to defendant Gaertner.   The County defendants' motion for summary judgment will be granted in full.

## V.  The State Defendants Motion for Summary Judgment

Defendants Rivard and Gough also move for summary judgment on all claims against them.   The plaintiffs' claims against these defendants are based on due process and Fourth Amendment violations.  Those that remain in the fourth amended complaint against Rivard are for falsification of evidence (Count I), conducting an unduly suggestive identification (Count II), and malicious prosecution (Count III).  The plaintiff pleaded claims for failure to disclose exculpatory information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) (Count IV) and malicious prosecution under state law (Count VI) against both Rivard and Gough.  They raise a variety of arguments, including absolute and qualified immunity.

### A.  Malicious Prosecution Against Gough

The claims against defendant Gough for any alleged involvement in conducting an improper lineup or fabricating evidence have been dismissed by stipulation of the parties.  The only facts that the plaintiffs have advanced to sustain the surviving claim for malicious prosecution against defendant Gough are that he allegedly "influenced the initiation of criminal proceedings" by "swearing falsely" before a magistrate judge who issued the arrest warrants that "two witnesses identified Sammons as the shooter," and by "failing to inform the magistrate" that neither plaintiff matched the descriptions of the driver and shooter stated by other witnesses to the shooting.  The

difficulty for the plaintiffs is that Gough's alleged conduct (or misconduct) in that aspect of the case is shielded by absolute testimonial immunity.

"In *Briscoe v. Lahue*, 460 U.S. 325 (1983), the Supreme Court concluded that 'all witnesses — police officers as well as lay witnesses — are absolutely immune from liability based upon their testimony in judicial proceedings.'" *Alioto v. City of Shively*, 835 F.2d 1173, 1174 (6th Cir. 1987) (quoting *Briscoe*, 460 U.S. at 328). "Although the Court declined to address whether witness immunity applies to pretrial proceedings, absolute witness immunity also bars actions for damages against individuals who testify in grand jury proceedings. The doctrine enunciated in *Briscoe v. Lahue* also shields from liability alleged conspiracies to give false and incomplete testimony in judicial proceedings." *Ibid.* (collecting cases). "'It is well-settled that witnesses are granted absolute immunity from suit for all testimony provided in judicial proceedings,'" and "[t]his immunity applies 'no matter how egregious or perjurious' the testimony." *Thurmond v. County of Wayne*, 447 F. App'x 643, 653 (6th Cir. 2011) (quoting *Spurlock v. Satterfield*, 167 F.3d 995, 1001 (6th Cir. 1999); citing *Briscoe*, 460 U.S. at 330-31).

The only alleged wrongful conduct here occurred in the context of a judicial proceeding before a state magistrate and allegedly comprised nothing more than "false swearing" before that judicial officer. All of the claims premised on that allegedly false testimony are barred by absolute testimonial immunity. The claims in Counts III and VI against defendant Gough for malicious prosecution will be dismissed.

### B. Malicious Prosecution Against Rivard

The plaintiffs allege malicious prosecution against defendant Rivard under 42 U.S.C. § 1983 and state law based on the allegation that Rivard fabricated the evidence of Jones's purported identification. Rivard argues that he is entitled to absolute testimonial immunity; the prosecution

was not terminated favorably to the plaintiffs' because the dismissal was by "*nolle prosequi*," which does not preclude a future refiling of charges; and he did not participate in any "initiation of the prosecution" because the decision to continue the bind over and proceed to trial was made by prosecutor Gaertner with full knowledge of the contradictory testimony by Rivard and Jones at the preliminary examination.

The elements of a Fourth Amendment malicious prosecution claim are "(1) that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) that the criminal proceeding must have been resolved in the plaintiff's favor." *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017) (quotations omitted). "The prototypical case of malicious prosecution involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person." *Ibid.*

The argument that no "favorable termination" occurred is a non-starter after the Supreme Court's decision in *Thompson v. Clark*, --- U.S. ---, 142 S. Ct. 1332 (2022), where the Court held that "[t]o demonstrate a favorable termination of a criminal prosecution for purposes of the Fourth Amendment claim under § 1983 for malicious prosecution, a plaintiff need only show that his prosecution ended without a conviction," *id.* at 1335. That fact is undisputed on this record.

There is ample evidence to support the malicious prosecution claim; under the circumstances, a determination that there was an absence of probable cause is not required. It has been clearly established law for decades past that a police officer is liable for malicious prosecution where he knowingly submits false information to the prosecutor that formed the basis of the charging decision. *Sykes v. Anderson*, 625 F.3d 294, 315-16 (6th Cir. 2010). In addition to the

Fourth Amendment claim, "[t]he Fourteenth Amendment bars an officer from knowingly creating false evidence to obtain a conviction.'" *Miller v. Gettel*, No. 22-1034, 2023 WL 2945340, at *6 (6th Cir. Apr. 14, 2023) (quoting *Sanford v. City of Detroit*, 815 F. App'x 856, 859 (6th Cir. 2020)).

Here, it is undisputed that the purported eyewitness identification of Sammons by DyJuan Jones was the centerpiece of the State's case at trial and was essential to the decisions to initiate and continue the charges.  The plaintiffs have supplied evidence from which a jury could find that Jones never identified anyone as the shooter and that Rivard's false account of the showup drove forward a criminal case, which had essentially no factual foundation otherwise.  That is sufficient to show that Rivard influenced the prosecution.  *See Sykes*, 625 F.3d at 315-16 (holding that a malicious prosecution claim against an investigating officer can "be based on [the officer's] 'knowing misstatements to the prosecutor' or his 'pressure or influence' over an individual who . . . made the decision to prosecute," even though the officer "did not make the decision to initiate the criminal proceedings against the Plaintiffs") (citations omitted).  It is well recognized that in such circumstances the investigator "cannot hide behind the officials whom [he has] defrauded," and defendant Rivard cannot avoid liability by claiming that it was the prosecutor who filed formal charges based on his own allegedly false report.  *Id.* at 316 (quoting *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988)); *see Gregory v. City of Louisville*, 444 F.3d 725, 747 (6th Cir. 2006) (stating that "[i]t is not true . . . that the prosecutor's discretion to control the state's case at trial is such an intervening act to excuse [the police investigator] from the "natural consequences" of his actions and therefore any tort liability.  In constitutional-tort cases, 'a man [is] responsible for the natural consequences of his actions.'") (quoting *Monroe v. Pape,* 365 U.S. 167, 187 (1961)).

Rivard also argues that the plaintiffs cannot proceed because other information uncovered during the investigation established probable cause for the arrest.  However, it is well settled that

under federal law "'[a] plaintiff does not need to show that the government lacked probable cause to prevail on a fabrication of evidence claim.'" *Miller*, 2023 WL 2945340, at *6 (quoting *France v. Lucas*, 836 F.3d 612, 629 (6th Cir. 2016)).  Michigan state law sets a somewhat higher bar and requires the plaintiff to prove that: "(1) the defendant initiated a criminal prosecution against the plaintiff; (2) the criminal proceedings terminated in the plaintiff's favor; (3) the person 'who instituted or maintained the prosecution lacked probable cause for his actions'; and (4) 'the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice.'" *Rogan v. Budzynowski*, No. CV 19-13477, 2022 WL 4703300, at *11 (E.D. Mich. Sept. 30, 2022) (quoting *Matthews v. Blue Cross & Blue Shield of Mich.*, 456 Mich. 365, 378, 572 N.W.2d 603 (1998)).  However, the most plaintiff-favorable view of the record here supports a finding that there was no probable cause to arrest or prosecute the plaintiffs absent the allegedly fabricated eyewitness identification.

As recognized by the state supreme court, there was remarkably little basis for charging Ramsey and Sammons apart from Jones's purported identification.  None of the other eyewitnesses identified either Ramsey or Sammons.  Detailed descriptions by Jones and other witnesses differed from Ramsey and Sammons in significant respects.  The investigators initially stopped the plaintiffs because they were two black males driving a grey Jeep within 10 to 20 minutes in the general vicinity of the shooting.  However, the witness's descriptions of the vehicle were indefinite, and the partial license plate number suggested by Jones did not match the plaintiff's vehicle.  In short, the plaintiffs were arrested for little more than "driving while black" and being in the wrong place at the wrong time, and they were prosecuted on no other physical or circumstantial evidence tangibly connecting them to the murder, aside from one tenuous and allegedly fictional eyewitness identification.  "The Sixth Circuit cautions that neither 'a bare

- 33 -

allegation of criminal wrongdoing,' *Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008), nor 'an individual's mere presence at a crime scene,' *Harris v. Bornhorst*, 513 F.3d 503, 515 (6th Cir. 2008), constitutes probable cause for arrest." *Johnson v. Adams*, No. 19-12331, 2021 WL 6125850, at *12 (E.D. Mich. Dec. 28, 2021). Even if the video surveillance footage, cell phone tower traces, and traffic stop established that the plaintiffs were present in the vicinity of the murder around the time it was committed, that is not enough to justify an arrest absent some other tangible connection to the crime. Moreover, defendant Rivard admitted at his deposition that before the showup was conducted, *there was no probable cause* to arrest or charge either plaintiff. The absence of probable cause element of the state law claim is sufficiently sustained here.

Rivard's testimonial argument also fails. The Sixth Circuit "has consistently held that absolute immunity for testimony at trial does not 'relate back' to shield pretrial, nontestimonial acts such as fabrication of evidence." *Gregory*, 444 F.3d at 742.

Finally, Rivard argues that he is entitled to state law governmental immunity against the malicious prosecution claim. "Malicious prosecution is an intentional tort," and "[t]herefore, governmental immunity protects [the defendant if he] can show (1) that he was acting in the course of his employment and at least reasonably believed that he was acting within the scope of his authority; (2) that his actions were discretionary, not ministerial, in nature; and (3) that he acted without malice and in good faith." *Hamann v. Charter Township of Van Buren*, No. 20-10849, 2021 WL 5312638, at *9 (E.D. Mich. Nov. 15, 2021) (citing *Odom v. Wayne County*, 482 Mich. 459, 480-81, 760 N.W.2d 217, 228 (2008)). The record here, viewed in the light most favorable to the plaintiff, suggests that Rivard knew he had no probable cause to arrest or charge the plaintiffs, but did so nevertheless after fabricating a false report of an eyewitness identification. That demonstration of bad faith defeats the governmental immunity defense. *Howard v.*

*Livingston County*, No. 21-1689, 2023 WL 334894, at *14 (6th Cir. Jan. 20, 2023) ("The complaint alleges that Taylor prosecuted Howard after his own investigation and an internal investigation by MDOC revealed no evidence of wrongdoing.  Reading those allegations in the light most favorable to Howard, we can't conclude that Taylor 'honestly believed that he had probable cause.' That is fatal to his claim of state law governmental immunity.") (citing *Odom*, *supra*).

C.  *Brady* Claims Against Defendants Rivard and Gough

The plaintiffs' claims for "*Brady* violations" are supported solely by their allegations that Detective Rivard and Trooper Gough failed to disclose to the defense the truth that DyJuan Jones never identified either plaintiff as being involved in the shooting.

"'[S]uppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'"  *Miller v. Gettel*, No. 22-1034, 2023 WL 2945340, at *7 (6th Cir. Apr. 14, 2023) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  "The elements of a *Brady* claim are that: (1) the evidence is favorable to the accused, (2) the 'evidence must have been suppressed by the State, either willfully or inadvertently,' and (3) prejudice resulted."  *Ibid.* (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).  "Also, 'police can commit a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material' from the prosecution."  *Ibid.* (quoting *Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009)).

Defendants Rivard and Gough are entitled to qualified immunity against the *Brady* claims because there is no clearly established law holding that the mere allegation that a defendant testified falsely or made a false statement can constitute a *Brady* violation where all of the evidence

- 35 -

that conceivably could bear on the truthfulness of the person's statement or testimony fully was aired on the record during a criminal trial, and there is no claim of late disclosure.

Here, the only information allegedly withheld was a potential admission by Rivard that he lied about whether Jones identified Sammons as the shooter. But the suggestion that Rivard lied plainly was known to the plaintiffs before trial, and the conflicting accounts of the identification by Rivard and Jones were explored exhaustively on the record during both the preliminary examination and the trial, when both Rivard and Jones were cross-examined. The conversation between Rivard and Jones, which became the subject of Rivard's police report and testimony, undisputedly occurred when only Rivard and Jones were present. No other witnesses observed the conversation, and no writing was made or subscribed to by either Jones or Rivard, other than Rivard's report, which undisputedly was disclosed to the defense before the criminal trial. Both Rivard and Jones appeared and testified at the preliminary examination and at trial. Moreover, the preliminary examination record prompted the defense in the criminal case to file a motion to suppress the identification based principally on Jones's insistence that he never had identified anyone as the shooter. The plaintiffs have not identified any other actual or potential evidence that existed bearing on the credibility of Rivard's testimony about the showup, and there was, therefore, no other material evidence that could have been withheld.

It is true, of course, that the knowing presentation of perjured testimony by a prosecutor may violate the *Brady* disclosure obligation if a prosecutor allows such testimony to stand uncorrected on the record at trial. "To prove that the prosecutor's failure to correct false testimony violated due process rights, a petitioner must demonstrate that: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Rosencrantz v. Lafler*, 568 F.3d 577, 583-84 (6th Cir. 2009) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972);

- 36 -

*Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998)).  However, in this case there has been no evidence put forth to show that Gaertner knew that Rivard's testimony about the identification showup was false, or that the prosecution withheld any information bearing on Rivard's credibility besides the obvious conflict with Jones's account.  At most, the record shows that Gaertner was aware of the conflicting accounts of the showup by Jones and Rivard, but that conflict fully was disclosed to the defense at the latest by the preliminary examination.

Other circuits have held that the *Brady* doctrine does not establish a constitutional claim every time an officer lies about facts in a criminal investigation.  *See Harris v. Kuba*, 486 F.3d 1010, 1017 (7th Cir. 2007) ("Harris essentially seeks an extension of *Brady* to provide relief if a police officer makes a false statement to a prosecutor by arguing that an officer is 'suppressing' evidence of the truth by making the false statement.  This court has already foreclosed this extension.").  On the other hand, where police fail to disclose extrinsic facts that influenced a witness to give false testimony, then a *Brady* violation may occur.  *See Avery v. City of Milwaukee*, 847 F.3d 433, 443-44 (7th Cir. 2017) ("In *Harris* the criminal defendant was just complaining that the officer didn't admit to falsifying his report. Here, in contrast, Avery knew that the informants' statements were false, but he did not know about the pressure tactics and inducements the detectives used to obtain them. And he did not know that Kimbrough had in fact recanted his statement just before trial but was told that he 'had to' testify. In other words, he did not have the evidence that could help him *prove* that the informants' statements were false.") (distinguishing *Harris*, *supra*).  But that is not the allegation here.  In this case, there were no other extrinsic circumstances bearing on the credibility of Rivard's testimony that were not plainly and fully disclosed to the defense on the record before or during the criminal trial.

The plaintiffs cite principally the Court's ruling denying a motion to dismiss by defendant police officers in *Sanford v. City of Detroit*, No. 17-13062, 2018 WL 6331342, at *10 (E.D. Mich. Dec. 4, 2018). However, *Sanford* is distinguishable. In *Sanford* two police investigators falsely reported and later testified in various court proceedings that a sketch of a crime scene that featured prominently in the prosecution's case had been created entirely by the plaintiff's own hand, during the course of what later was alleged to be a coerced confession. However, one of the detectives admitted many years later to a state police investigator who was reinvestigating the murder that in fact the outline of the scene and furnishings had been drawn by the detective, not by the plaintiff, and that the plaintiff only had added marks indicating the positions of bodies at the scene (which the plaintiff allegedly only knew because the other detective involved in the interrogation previously had showed him photographs of the murder scene). In *Sanford* what was suppressed by the state was not only the investigators' admissions that they lied about how the sketch was made, but also the affirmative truthful details about how the sketch was created, which had obvious evidentiary value in diminishing the credibility of the plaintiff's confession. In this case, there undisputedly are no further positive evidentiary details bearing on the credibility of Rivard's account of the showup identification, beyond the information that was aired fully on the record at both the preliminary examination and again at trial.

Because there was no constitutional violation under *Brady* or any related constitutional doctrine, the defendants are entitled to qualified immunity against the Count IV claims.

### D. Falsification of Evidence Claim Against Rivard

Defendant Rivard contends that the claim that he falsified evidence about Jones's identification is barred by absolute testimonial immunity and qualified immunity. The Court disagrees.

The Sixth Circuit has recognized since at least 1994 that a criminal suspect has a clearly established right under the Due Process Clause not to be charged and convicted by the State based on fabricated evidence. *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997) (collecting cases). "A claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant." *Ibid.* The plaintiff-favorable version of the facts in this case makes out a viable cause for falsification of evidence. Jones testified twice on the record adamantly denying that he ever identified plaintiff Sammons as the shooter. Rivard, however, wrote in a report and later testified that Jones *did* identify Sammons. The fact question that bars summary judgment on this claim is obvious: Did Jones identify Sammons or did he not? The jury will have to decide.

Defendant Rivard's assertion that the falsification of evidence claim is barred by his absolute testimonial immunity ignores the plaintiffs' basic claim, which is based on allegations that their fabrication of evidence claims involve pretrial, non-testimonial conduct that prompted a prosecutor's decisions to initiate and continue a criminal case. "Subsequent testimony cannot insulate previous fabrications of evidence merely because the testimony relies on that fabricated evidence. This Court has never endorsed such a self-serving result. Merely because a state actor compounds a constitutional wrong with another wrong which benefits from immunity is no reason to insulate the first constitutional wrong from actions for redress." *Gregory*, 444 F.3d at 738-39; *id.* at 741-42 ("Plaintiff alleges and puts forth evidence that the investigative notes are false. Carroll and Clark are not entitled to absolute immunity for these pre-trial acts; accordingly, this Court affirms the district court's refusal to grant Carroll and Clark absolute immunity on Plaintiff's fabrication of evidence claims."). As the Sixth Circuit has explained:

> Absolute immunity shields all testimony given in judicial proceedings, including perjured testimony. Deeply rooted in common law, testimonial immunity protects

the integrity of the trial process by preventing witnesses from self-censorship out of fear of future liability.  But it offers no protection to pretrial conduct, including the fabrication of evidence later adopted in trial testimony; that receives only qualified-immunity protection.

*LeFever v. Ferguson*, 567 F. App'x 426, 430 (6th Cir. 2014).

And Rivard's qualified immunity argument fails in the face of the clearly established law mentioned above, that a criminal defendant's due process rights are violated by the state's knowing use of fabricated evidence.  *Stemler*, 126 F.3d at 872.  Rivard's summary judgment motion as to the plaintiffs' claims in Count I will be denied.

### E.  Unduly Suggestive Identification Claim Against Rivard

The plaintiffs contend that defendant David Rivard violated their rights under the Due Process Clause when he arranged for an unduly suggestive identification procedure with witness DyJuan Jones.  Defendant Rivard argues that he is entitled to qualified immunity on this claim because "six out of the eleven judges" who reviewed the case at various levels of the state courts "disagreed" about whether the identification was unduly suggestive, demonstrating that there was no clearly established law holding that the showup was constitutionally improper,

Under the qualified immunity procedure discussed above, the plaintiffs must make the twin showings of a violation of a constitutional right and that the right was clearly established at the time.  *McDonald*, 814 F.3d at 812 (citing *Quigley*, 707 F.3d at 680).  Here, it is beyond debate that a criminal suspect's "right to be free of unduly suggestive identification procedures" is a "known constitutional right."  *Gregory*, 444 F.3d at 745-46 (reiterating that "[c]riminal suspects have a constitutional right to be free from identification procedures 'so unnecessarily suggestive and conducive to irreparable mistaken identification' that the identification's use violates due process of law'") (quoting *Stovall v. Denno,* 388 U.S. 293, 302 (1967)).  A pretrial identification procedure is unduly suggestive if it "steered the witness to one suspect or another, independent of the

witness's honest recollection."  *Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001).  It is well recognized under clearly established law that a showup where a witness is presented with no alternatives to a single suspect is an "inherently suggestive" procedure.  *Summitt v. Bordenkircher*, 608 F.2d 247, 252 (6th Cir. 1979), *aff'd sub nom. Watkins v. Sowders*, 449 U.S. 341 (1981) ("A showup is inherently suggestive. When only one person is presented to a witness, there is a natural tendency for the witness to feel obligated to provide a positive identification.").

Under the law of some states, stationhouse showups are considered so unreliable that the resulting identification is inadmissible in a criminal trial as a matter of law.  *E.g.*, *People v. Riley*, 70 N.Y.2d 523, 529, 517 N.E.2d 520, 522 N.Y.S.2d 842 (1987); *State v. Gordon*, 185 Conn. 402, 414, 441 A.2d 119 (1981) ("The circumstances of the station house show-up unnecessarily suggested to the victim that she should positively identify the defendant."), *overruled on other grounds by State v. Artis*, 314 Conn. 131, 101 A.3d 915 (2014).  However, under federal law, a single person showup, although unduly suggestive, "does not, in and of itself, violate constitutional rights."  *Gregory*, 444 F.3d at 747 (citing *Manson v. Brathwaite*, 432 U.S. 98, 113 (1977)).  There are times, for instance, when "a showup becomes a necessary identification procedure."  *Summitt*, 608 F.2d at 252 (citing *Stovall*, 388 U.S. at 293 (1967)).  Those occasions are prompted by exigent circumstances, such as a witness who is *in extremis*.  *See, e.g.*, *Stovall*, 388 U.S. at 302; *Summitt*, 608 F.2d at 252.

There is little doubt that the single-person stationhouse showup conducted by Rivard was unduly suggestive.  His argument to the contrary based on his assertion that several state court judges held otherwise fails for two reasons.  First, the judges who would have upheld the admission of the identification evidence did not find that the procedure was not suggestive; they determined that despite the unduly suggestive procedure, the identification was reliable — a conclusion

ultimately rejected by the Michigan Supreme Court.  *See Sammons*, 505 Mich. at 55, 949 N.W.2d at 51.  Second, any purported disagreement about the suggestivity of the procedure — here a near-even split among the judges, according to the defendant — highlights a substantial fact question. *See Gregory*, 444 F.3d at 746 (noting that when addressing "allegations of suggestive identification procedures," "the decision is one for the finder of fact").  And on a motion for summary judgment, the facts are viewed in the light most favorable to the non-moving party.  *Anderson*, 477 U.S. at 251-52.  "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts."  *Scott*, 550 U.S. at 378.

When an identification procedure is challenged in a criminal case, courts use "a two-step evaluation."  *Mills v. Cason*, 572 F.3d 246, 251 (6th Cir. 2009)).  In the first step, we ask whether the procedure was unnecessarily suggestive.  If it was, then we look to the totality of the circumstances to decide whether the identification was nonetheless reliable.  *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).  Because application of the qualified immunity rules prevents "defin[ing] clearly established law at a high level of generality," *Kisela v. Hughes*, 138 S. Ct. at 1152, we must look to the circumstances, including necessity and reliability, to assess the alleged constitutional violation.  Admission of a reliable identification at trial would not have violated the plaintiffs' right to due process.

The showup in this case easily could be found to have been unnecessary.  There was no exigency in the case because the victim already was dead, and no eyewitnesses were injured.  The defendants have offered no other justification for conducting a showup other than that they preferred not to arrange for a corporeal lineup.  In other cases where a suspect already was in custody and there was no immediate hazard to any victim or witness, courts in this circuit have found that a showup was unnecessary and unduly suggestive.  *E.g.*, *United States v. Diaz*, No. 19-

0197, 2021 WL 1110671, at *2 (M.D. Tenn. Mar. 23, 2021).  The jury readily could conclude that the showup procedure in this case was both unduly suggestive and unnecessary.  *See Salter v. Olsen*, 605 F. Supp. 3d 987, 1011 (E.D. Mich. 2022) ("The court finds that Salter has met his burden to show his right was clearly established.  As Salter correctly points out, and this court discussed above, courts have found that single-photo identifications are unnecessarily suggestive.  Olsen does not point to any exigent circumstances that warranted the single-photo identification.  Furthermore, a reasonable DPD officer would be on notice that a single-photo identification is problematic because DPD policy at the time stated that '[w]itnesses should never be shown only a photograph of the suspect.'") (citing *Stovall*, 388 U.S. at 302).

An identification procedure is impermissibly suggestive when it "give[s] rise to a very substantial likelihood of irreparable misidentification."  *Sexton v. Beaudreaux*, 585 U.S. ---, 138 S. Ct. 2555, 2559 (2018) (cleaned up).  There is plenty of evidence in the record to establish that the identification was not reliable and led to misidentification.  Factors to consider include "(1) the opportunity of the witness to view the defendant; (2) the degree of the witness's attention; (3) the accuracy of the prior description of the defendant; (4) the level of certainty shown by the witness at the pretrial identification; and (5) the length of time between the initial observation and the identification."  *Dalmida v. Turner*, No. 19-3627, 2020 WL 7873080, at *4 (6th Cir. July 22, 2020) (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); *Biggers*, 409 U.S. at 199-200).

The Michigan Supreme Court applied these factors to reach its conclusion of unreliability in the underlying criminal case.  *Sammons*, 505 Mich. at 51-55, 949 N.W.2d at 49-51.  The crucial factors in its analysis were that (1) the opportunity Jones had to view the shooter was brief, hectic, and punctuated by chaotic violence, with the entire incident lasting less than a minute; (2) Jones admittedly did not focus on the shooter but on the gun and the shooting, testifying that he "wasn't

paying attention" to the features of the shooter and that "I seen [sic] the gun, [but] I can't identify the person who was really."; (3) relatedly Jones's identification was far from certain in any sense — in fact Jones testified on two occasions and adamantly denied that he could identify anyone as the shooter; and (4) the details related by Jones matched the plaintiffs only in the most general sense, in that both were black males who were apprehended while riding in a grey Jeep — other details related by Jones such as the description of the driver as heavy set with a long beard, fragments of the license plate, and the fact that the shooter was bald, did not match up with Ramsey or Sammons or their vehicle. A jury easily could reach the same conclusion on this record.

On similar facts, the district court in *Salter* observed that "this circuit 'has never found that an identification arising from a suggestive format was anything but *unreliable* when the witness' prior description of the suspect was significantly inconsistent with the suspect's actual appearance.'" *Salter*, 605 F. Supp. 3d at 1011-12 (quoting *Gregory*, 444 F.3d at 756; citing *Thigpen v. Cory*, 804 F.2d 893, 897 (6th Cir. 1986); *Webb v. Havener*, 549 F.2d 1081, 1086 (6th Cir. 1977); and *Marshall v. Rose*, 499 F.2d 1163, 1167 (6th Cir. 1974)).

The law clearly established in 2015 that conducting a showup under the routine and nonemergent circumstances as existed in this case is both an unduly suggestive and unnecessary procedure, and the resulting purported identification readily could be found to be unreliable according to clearly established precedent. Defendant Rivard therefore is not entitled to qualified immunity against the unduly suggestive identification claim.

\* \* \* \* \*

Defendant Rivard is not entitled to qualified immunity or dismissal of the claims against him in Counts I, II, or III of the fourth amended complaint.

VI.  Plaintiffs' Motion for Partial Summary Judgment

The plaintiffs move for partial summary judgment on the issue of liability, arguing that there are no material fact questions about whether the identification procedure was unduly suggestive and unnecessary or whether the resulting identification was reliable.  The plaintiffs' presentation for the most part elaborates on the analysis by the Michigan Supreme Court in the ruling reversing Sammons's conviction.  The defendants' oppositions reiterate the positions taken in their respective summary judgment motions.

As discussed above, there is ample evidence in the record from which a jury could conclude that the showup procedure was unduly suggestive and unnecessary, and that the resulting purported identification was unreliable.  However, the plaintiffs' arguments for a judgment in their favor on liability overlooks a fundamental factual dichotomy in their theory of the case.  The posture of the claims is unusual here because the plaintiffs have pleaded and apparently intend to proceed to trial on two conflicting and mutually exclusive theories of liability, the reconciliation of which necessarily depends on the resolution of a central question of material fact.  Of course, the plaintiffs are entitled to present alternative theories of the case — even conflicting ones — and allow the jury to choose between them.  However, doing so will require making a definitive finding on one hotly disputed fact, and that is an exercise in which the Court does not engage at the summary judgment stage.

The central factual question in this case is: Did Jones identify Sammons as the shooter? Rivard says he did; Jones says he did not.  Both things cannot be true.  The jury must decide which of those stories to believe.  If the jury accepts Jones's testimony as true and believes that he never identified Sammons at any time, then the plaintiffs cannot prevail on their unduly suggestive identification claim, because that would mean that *there never was an identification* of either

plaintiff by anyone.  It is axiomatic that an essential element of every civil rights claim is the establishment of causation between the allegedly wrongful conduct and the plaintiff's injury. *Deaton v. Montgomery County*, 989 F.2d 885, 889 (6th Cir. 1993) ("Congress did not intend § 1983 liability to attach where causation is absent.").  If the jury determines that no identification ever occurred, then no identification procedure can be causally connected with the resulting prosecution and conviction, because the procedure cannot be held to have tainted an identification by any eyewitness if no witness ever identified either plaintiff as a perpetrator.

To put it another way, the only positive testimony ever presented about the identification was by Rivard, who said that Jones identified Sammons as the shooter.  But it certainly cannot be said that Rivard's testimony was in any way "influenced" by the showup process.  If he was lying, then it was not due to any defect in the suggestive showup procedure, but merely because he decided to falsify evidence.

Rendering judgment as a matter of law on the suggestive identification claim would require the Court to make a finding on a disputed fact and to determine that Jones did identify Sammons as the shooter.  That is not only beyond the Court's role at the summary judgment stage, it also would foreclose the plaintiffs from proceeding to trial on their fabrication of evidence claims, which they have not abandoned.  The resolution of liability before trial is not possible, because reconciling the competing theories of liability in Counts I and II is the province of the jury, not the Court, which must resolve the factual tension between them.

VII.

There is no basis to exclude the challenged testimony of David Rivard or Douglas Gough. The proposed testimony by Mark Gaertner is allowable, except for his opinions that Rivard was not lying to him and that the plaintiffs were involved in the murder.  The proposed opinion

testimony by Denver Butler is supported by a sufficient foundation.  The claims against Saginaw County have been conceded, and the claims against Mark Gaertner are barred by absolute and qualified immunity.  The record does not support any claims against defendant Douglas Gough. Defendant Rivard is not entitled to qualified immunity or dismissal of the claims against him of malicious prosecution, falsification of evidence, or conducting an unduly suggestive identification procedure, but he is entitled to dismissal of the claim based on *Brady v. Maryland*.  Fact questions preclude summary judgment for the plaintiffs.

Accordingly, it is **ORDERED** that the plaintiffs' motion to preclude testimony by police officers Gough and Rivard (ECF No. 59) is **DENIED**.

It is further **ORDERED** that the plaintiffs' motion to bar the testimony of assistant prosecutor Mark Gaertner (ECF No. 60) is **GRANTED IN PART AND DENIED IN PART**. Prosecutor Gaertner shall not give his opinions that Rivard was not lying to him or that the plaintiffs were involved in the murder.  The motion is **DENIED** in all other respects.

It is further **ORDERED** that the defendants' motions to exclude the testimony of Denver Butler (ECF No. 64, 67) are **DENIED**.

It is further **ORDERED** that the County defendants' motion for summary judgment (ECF No. 61) is **GRANTED**.  All counts of the fourth amended complaint are **DISMISSED WITH PREJUDICE** as to defendants Gaertner and Saginaw County, only.

It is further **ORDERED** that the State defendants' motion for summary judgment (ECF No. 63) is **GRANTED IN PART AND DENIED IN PART**.  All counts of the fourth amended complaint are **DISMISSED WITH PREJUDICE** as to defendant Gough.  Count IV of the fourth amended complaint alleging a violation of *Brady v. Maryland* is **DISMISSED WITH PREJUDICE**.  The motion is **DENIED** in all other respects.

It is further **ORDERED** that the plaintiffs' motion for partial summary judgment (ECF No. 72) is **DENIED**.

The case will proceed to trial on Count I (fabrication of evidence), Count II (use of an unduly suggestive eyewitness identification procedure, Count III (malicious prosecution under 42 U.S.C. § 1983) and Count VI (malicious prosecution under state law) of the fourth amended complaint against defendant Rivard.

It is further **ORDERED** that counsel for the parties shall appear for a status conference **on October 17, 2023 at 9:00 a.m.** to discuss the trial schedule.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   September 26, 2023